

July 21, 2016

<u>VIA ECF</u>
Honorable Andrew L. Carter
United States District Judge
40 Foley Square
New York, New York 10007

                 Re: *United States v. Lawrence Okai*
                      *Ind. # 14-673 (ALC)*

Dear Judge Carter:

       Your Honor has indicated that it is considering Mr. Okai's harsh jail conditions in Ghana, Africa, prior to being incarcerated here in United States, as a basis for a downward departure. In our original sentencing submission, Mr. Okai urged this court to consider his prior incarceration in Ghana as mitigation under §3553 and sentence him below the advisory guidelines range. Please accept the following letter as further evidence of those deplorable conditions and further support as to why Mr. Okai's traumatic experience warrants a downward departure given this exceptional circumstance.

       Indeed, there was a question as to whether the Plea Agreement between Mr. Okai and the government prohibited Mr. Okai to present argument in response to your Honor's contemplation of a downward departure. Upon further review, Mr. Okai submits that the Plea Agreement freely permits him to "answer any inquiries and to make all appropriate arguments" when a Court contemplates a departure. *See Plea Agreement, pg. 4.*

       As indicated in my original submission, Ghana is notorious for its deplorable jail time conditions. As attached to the original sentencing submission, the United States Department of State's "Country Reports on Human Rights Practices for 2013 for Ghana," report that "prison conditions in Ghana were generally harsh and sometimes life threatening." certain aspects of it including. To further illustrate the deplorable conditions under which Mr. Okai's was incarcerated in Ghana, I have attached a letter from him describing his experience for those six months before he was transported to the United States. It reads as follows:

The following are my personal experiences during the 6 months I spent detained in Ghana pending extradition. Nothing dramatic, made up or exaggerated. As matter of fact I will like you to check up an investigative journalist named Anas-Aremeyaw Anas on his investigative quests into some these conditions. Also pull up information on the following police cells where I was detained for 4 months respectively before finally ending up at Nsawam Prison for 2 months; Legon, East Legon, Cantonments and Nima Police stations. My co defendants as well the other culprits who were arrested at the same time will corroborate every account I have given.

I was subjected to deplorable conditions, Incredible overcrowding, filth, disease, no clear water for bathing and sanitation and sometimes no water at all. No food, sanitation, medical assistance were ever provided. I was ankle deep in feces and cockroaches, bugs, termites, ants, worms, maggots mice crawled all over the place.

My family had to bring me food and drinking water and medical supplies twice supplies I wanted to buy anything in between late meals, I had money deposited at the front desk of the police cells. The police will then take money from my account and buy me food as well as buy some for themselves.

When I passed out one time of claustrophobia, I had to wait an hour for my CID agent(criminal Investigation Department) to turn up and pick me up in his private car and armed convoy to the police hospital. The medicine that was prescribed was paid by me.

Also there was no mattresses as I slept on the bare floor. On an occasion where My family bought me a

```
mattresses I wasn't allowed to take it to my other
police station when I was transferred  as well my
spending money in my account since it is not automated
but rather kept in a locker.


Sometimes when water was shut my family filled up Jerry
cans and dropped them for me at the station. I was not
allowed phone calls as there are no phones. SO in an
emergency I had to buy credits for a police man so he
could use his cell phone to call on my behalf at an
extortionate rate.


There was no light, no sunlight no exercise or
recreation. Just sitting or lying down in an 18 ft by
18 cell packed enough not to have a place to step . No
ventilation as there no windows, smell, stench form
both sweat and excrements. Also suffered abuse and
extortion by "senior inmates" popularly called cell
leaders in concert with the police as they receive
their cut of the proceeds extorted.
```

  Moreover, federal courts have held that held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F.3d 191,196; see also *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996*); United States v. Bunton*, 139 F.3d 718, 725 (9th Cir. 1998). In recognizing the offender's pre- or post-sentence conditions of confinement as permissible grounds to warrant downward departures, courts have granted relief where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner. *See United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (finding that defendant had suffered "extraordinary stress and fear" under conditions at a state prison qualitatively different from those experienced by detainees of federal detention facilities).

  Right here, in this District, the case of *United States v. Mateo*, 299 F.Supp 2d 201 (2004) is persuasive. In *Mateo*, a female defendant was pregnant but did not receive the appropriate care at the MDC in Brooklyn. As a result, the defendant gave birth sitting upright on a stretcher, inside the facility without any pain medication. Judge Marrero of this District, said the following:

> There are also instances, however, in which, by reason of individual circumstances, some of the stings and hardships that imprisonment

>implies come to bear extraordinarily more heavily on some inmates than on others. Particularities affecting some individuals may cause some of the adjunct losses that follow criminal conviction to engender what amounts to materially enhanced deprivations and suffering that, for some offenders more than others, may operate as functional equivalents of punishment by time in prison and that may also consequentially produce other substantially greater adverse social effects.

*Mateo* at 28-29.

As a result, Judge Marrero found that the "extraordinary trauma" the defendant had already suffered during the time she has served in custody, "the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines" for the defendant's offense. *Id.* Judge Marrero emphasized that the defendant's experience was "uniquely extraordinary, beyond the heartland of ordinary disparities, thereby justifying departure." *Id.* Thus, the Court granted a **nine-level downward departure** to the defendant.

By the same token, Mr. Okai's living conditions for 6-months in a Ghanaian jail rise to a similar level of "extraordinary trauma" to an "exceptional degree." For those 6-months, Mr. Okai was subject to prodigious overcrowding and living conditions, such as unclean water, limited food, limited bathing facilities, limited medical care, rodents, and human waste. Equally as traumatic, Mr. Okai had very limited contact with the outside world like his family, and was deprived of basic requirements like sunlight, exercise and recreation. In sum, he was treated more like an abused animal than a human being.

Mr. Okai's experience in a Ghanaian jail was far different and far worse than his experience would be in an American federal prison. In other words, a day in a Ghanaian prison is equates to more punishment than a day in an American prison. For sentencing purposes, therefore, this Court should credit Mr. Okai for more than 6-months in the Ghanaian jail considering the harsh and atypical conditions under which he suffered before he was extradited to the United States.

Should the Court ultimately determine that a downward departure is not appropriate, we respectfully urge the Court to consider the same facts and argument under § 3553 as mitigation to support a sentence below the advisory guideline range.

Furthermore, the Court also raised the issue of whether the BOP will include his time spent in Ghana as jail time credit. According the DOJ's " Legal Resource

Guide to the Federal Bureau of Prisons 2014, "sentence credit is awarded for any time spent in official detention prior to the date a term of imprisonment commences, provided it was served as a result of the offense for which the sentence was imposed, or as a result of any offense (state or federal) for which the defendant was arrested after committing the offense for which the federal sentence was imposed." *See* 18 U.S.C. §3585(b).  Additionally, "after a defendant is sentenced, the BOP is responsible for determining what period(s) of prior custody may be credited toward the federal term of imprisonment. *See United States v. Wilson*, 503 U.S. 329 (1992).

      Here, Mr. Okai was arrested and detained in Ghana on March 13, 2014.  He was extradited to the United States over 6-months later on September 26, 2014.  He first appeared in the SDNY on September 29, 2014.  Given that Mr. Okai was incarcerated in Ghana on March 13, 2014, as "a result of" the instant federal offense for which he was arrested, the BOP will <u>most likely</u> credit him with for his prior custody time.  However, what the BOP should do and what will be done may be different.  It is therefore respectfully requested that this Court underscore to the BOP that Mr. Okai receive full jail time credit from March 13, 2014 - the time he was first incarcerated in Ghana as a result of his arrest on this case.   Should the BOP fail to credit Mr. Okai for this prior jail time, he reserves his right to petition this Court to rectify the situation under the appropriate legal recourse.

      Respectfully submitted,

      SULLIVAN & BRILL, LLP

      *[signature]*

      By: Steven Brill

cc: AUSA Brendan Quigley, *Via ECF and Email*